J-S59015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: H.L.P., JR. A/K/A H.M. A/K/A B.B.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| APPEAL OF: H.P., NATURAL FATHER, | |
| Appellant | No. 813 WDA 2015 |

Appeal from the Decree April 22, 2015
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): 53 IN ADOPTION 2014

BEFORE:  BOWES, DONOHUE, AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 09, 2015**

H.P. ("Father") appeals from the April 22, 2015 decree terminating his parental rights to his son, H.L.P., Jr. a/k/a/ H.M. a/k/a B.B.M.[1]  We affirm.

The Erie County Office of Children and Youth ("OCY") first became involved with H.L.P., Jr. during December 2009, following his premature birth.  The agency interceded due to reports that H.L.P., Jr. was born with traces of cocaine in his system.  The child was adjudicated dependent and placed initially with his current pre-adoptive foster parents ("Foster Parents").  However, Father gained physical custody of the child for four

_____

[1] The orphans' court also terminated the parental rights of H.L.P., Jr.'s mother, C.A.M.  She did not appeal.

_____

*  Former Justice specially assigned to the Superior Court.

months during spring 2011. OCY eventually removed H.L.P., Jr. from Father's care on June 22, 2011, after Father tested positive for cocaine and failed to attend two urine screens. Thereafter, H.L.P., Jr. resided in a kinship foster home until October 30, 2012, when the then-nearly-three–year-old child was placed with his paternal aunt ("Aunt") under a subsidized permanent legal custodianship ("SPLC"). On that date, the juvenile court closed the dependency case and discharged H.L.P., Jr. from OCY's care and supervision.

OCY became reacquainted with the family fifteen months later, after Aunt declared her intention to relinquish SPLC due to Father's continued harassment and interference. On January 28, 2014, the juvenile court entered an emergency protective order that temporarily returned physical and legal custody to OCY. The agency reunited H.L.P., Jr. with Foster Parents, where he remains. In the interim, Foster Parents, whom H.L.P., Jr. refers to as Mom and Dad, adopted two of his half-siblings on his birth mother's side.

Father's substance abuse was the central concern of the ensuing dependency adjudication. The evidence submitted at that hearing revealed that Father not only had recently tested positive for marijuana, but he had also failed to attend five drug screens. On March 6, 2014, the juvenile court adjudicated H.L.P., Jr. a dependent child for a second time. The primary permanency goal of the dependency proceeding was reunification with

Father. The concurrent goal was adoption. The juvenile court ordered Father to comply with a litany of conditions including: submit to random drug testing; participate in mental health assessment; utilize recommended treatment options; verify gainful employment and stable housing; attend H.L.P., Jr.'s medical appointments; and participate in parenting classes and demonstrate parenting skills during his supervised visitation with H.L.P., Jr. The juvenile court ordered supervised visitations between Father and H.L.P., Jr. that were contingent upon Father's continued sobriety and reflective of his progress with court-ordered services.

Unfortunately, Father's progress was minimal. During the first permanency review hearing, the trial court found that Father had not complied with the court-ordered permanency plan nor made any progress toward alleviating the circumstances that necessitated H.L.P., Jr.'s placement. Father's progress improved negligibly over the next two months, and the juvenile court's subsequent permanency review order entered on July 22, 2014, changed H.L.P., Jr.'s placement goal from reunification to adoption.

On August 19, 2014, OCY filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1),(2) and (b). During the ensuing evidentiary hearing, OCY presented testimony from Patricia Potter, H.L.P., Jr.'s outpatient therapist; Mary Bliley, the OCY caseworker assigned to the family; and Gaylene Abbot-Fay, the OCY permanency worker who observed

H.L.P., Jr.'s interaction with Foster Parents. Father testified on his own behalf and presented the testimony of his step-father and a former OCY caseworker. At the close of the hearing, the orphans' court entered on the record its findings of fact and conclusions of law and determined that OCY established by clear and convincing evidence the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(1),(2) and (b).

Father filed a timely notice of appeal and a concomitant Rule 1925(b) statement. He presents three issues for our review:

> 1. Whether the orphan's [sic] court committed an abuse of discretion or errors of law when it concluded that the [Erie County Office of Children and Youth] established grounds for termination under 23 Pa.C.S.A. [§] 2511(a)(1).
>
> 2. Whether the orphan's [sic] court committed an abuse of discretion or error of law when it concluded that the [Erie County Office of Children and Youth] established grounds for termination under 23 Pa.C.S.A. [§] 2511(a)(2).
>
> 3. Whether the Orphan's court committed and abuse of discretion or error of law when it concluded that the [Erie County Office of Children and Youth] established grounds for termination under 23 Pa.C.S.A. [§] 2511(b).

Father's brief at 4.

We review the orphans' court's order to grant or deny a petition to involuntarily terminate parental rights for an abuse of discretion. **In re C.W.U., Jr.**, 33 A.3d 1, 4 (Pa.Super. 2011). "[W]e are limited to determining whether the decision of the trial court is supported by competent evidence." **In re R.L.T.M.**, 860 A.2d 190, 191 (Pa.Super. 2004)

- 4 -

(quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa.Super. 2000)). However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re C.W.U., Jr.*, *supra* at 4. As the ultimate trier of fact, the orphans' court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id*.

As the party petitioning for termination of parental rights, OCY must prove by clear and convincing evidence the statutory criteria for that termination. *In re P.Z.*, 113 A.3d 840, 850 (Pa.Super. 2015). Clear and convincing evidence is "testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *In re Adoption of M.R.B.*, 25 A.3d 1247, 1251 (Pa Super 2015) (*quoting In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)).

Requests to involuntarily terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

> (a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused to failed to perform parental duties.
>
>     . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has casued the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>     . . . .
>
> (b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

We need only agree with the trial court's decision as to one subsection of 23 Pa.C.S. § 2511(a) in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Herein, we agree with the trial court's decision to terminate Father's parental rights pursuant to subsections 2511(a)(1) and (b).

- 6 -

As it relates to §2511(a)(1), the pertinent inquiry for our review follows:

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. . . . Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re D.J.S.*, 737 A.2d 283, 285 (Pa.Super. 1999) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)) (internal citations omitted). Although the six months immediately preceding the filing of the petition are the most critical to the analysis, the orphans' court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. *In re B.,N.M.*, 856 A.2d 847 (Pa.Super. 2004). Additionally, to the extent that the orphans' court based its decision to terminate parental rights pursuant to subsection (a)(1), "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." In *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), we explained, "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available

resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship."

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the orphans' court must then engage in three additional lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008).

In granting OYC's petition for involuntary termination, the trial court determined as follows:

> Since at least January 28, 2014, when the child was removed from the care of [Aunt], [Father] either evidenced a settled purpose of relinquishing parental claim to [H.L.P., Jr.] or refused or failed to perform parental duties. [Father] never obtained employment or verified income; two urinalysis results were positive and he failed to show for the other 56 scheduled urinalysis screenings; he did not participate in parenting class as directed; OCY was unable to verify his housing status; and [Father] failed to show any interest whatsoever in the child by sending him cards, gifts, or letters. [Father] has never contacted OCY to inquire about the child. Aside from "talk", [Father] has refused or failed to accept parenting responsibility. [Father] refused to take even modest steps to facilitate [H.L.P., Jr.'s] return to his care. [Father] failed to exert himself to take to take and maintain a place of importance in the child's life. [Father] admitted he could have been more responsible. Appellee established by clear and convincing evidence the grounds for termination of parental rights at 25 Pa.C.S.A. §2511(a)(1).

Trial Court Opinion, 6/22/15, at 7.

The record supports the orphans' court's determination. During the evidentiary hearing, Mary Bliley, the OCY caseworker assigned to the family, testified as follows about Father's noncompliance with the court-ordered services. She became involved with the family during February 2014, shortly after H.L.P., Jr. was adjudicated dependent following Aunt's relinquishment of SPLC. N.T, 4/21/15, at 35, 40-41. While Father had been involved and active during the family's first contact with the juvenile court, he was uncooperative with OCY and its service agencies following the second adjudication of dependency. *Id*. at 38, 46, 52. He refused to execute a release that permitted OCY to access required information to verify that he underwent the court-ordered mental health assessment or obtained regular employment or safe and stable housing.[2] *Id*. at 46, 49-50. Likewise, he declined to attend parenting classes or complete the required drug screens. *Id*. at 48, 51-52.[3] As it relates to visitation, Father attended only three

---

[2] Father eventually executed a release to permit OCY to access his mental health assessment. N.T., 4/21/15, at 49. Similarly, although Father failed to verify his employment, Ms. Bliley was familiar with his efforts to open a barbershop. *Id*. at 54-55, 59.

[3] OCY referred Father to the Erie Family Center for parenting classes. However, Father refused to participate because he previously attended a parenting program as a component of the first dependency. N.T., 4/21/15, at 47-48.

supervised visitations with H.L.P., Jr. before the visits were terminated as a consequence of his failure to comply with the drug testing regimen. *Id*. 50, 57, 61. In Ms. Bliley's opinion, Father simply did not remedy the circumstances that led to his son's second placement. *Id*. at 52.

The testimony of Nicole Seelbach, the person who coordinated Father's drug screens, confirmed Father's meager effort to attain sobriety. *Id*. at 31-33. She highlighted that Father failed drug screens on January 27, 2014 and April 21, 2014, testing positive for the presence of marijuana during both instances. *Id*. at 33. Additionally, Father refused fifty-six other urine screens between January and July 2014. Ms. Seelbach explained that OCY counted every missed urine test as a "no-show" positive drug screen. *Id*.

In addition, H.L.P. Jr.'s cognitive behavior therapist, Patricia Potter, testified about Father's lack of participation in his son's therapy to address the child's reactive attachment disorder. *Id*. at 15, 17-18. The condition caused the child anxiety and uncontrollable aggressive behaviors. She testified that therapeutic parenting was very effective in addressing attachment disorders. One important aspect of the therapy was parental interactions. *Id*. at 14. Ms. Potter explained, "[I]t's the holding, nurturing process. It's allowing them to identify and express their feelings. It's about touch. It's nurturing. . . . It's a whole different parenting approach and is utilized for children who are securely attached." *Id*. at 18. Despite the importance of Father's participation in his son's therapeutic parenting, Father

failed to adhere to his son's treatment objectives. *Id*. at 20. He missed three of the six therapeutic sessions. *Id*. at 16. Moreover, Father was argumentative, defensive, and rebellious during the three sessions that he did attend. Indeed, in contrast to the importance that Ms. Potter placed on the parental interactions, Father deemed therapeutic parenting unnecessary and opined, "that [she] was just spoiling [the] child". *Id*. at 17-18. Additionally, Father informed Ms. Potter of his refusal to abstain from drug use, and he expressly rejected her recommendation to participate in substance abuse and mental health treatment. *Id*. at 19.

Father's own witness, former OCY caseworker Leatrice Schoolcraft confirmed that, while Father was initially cooperative with the agency, once he failed the drug screens during January 2014, Father refused to submit to additional testing and complained that the drug testing component was unfair. *Id*. at 96, 97-98. Likewise, Ms. Schoolcraft stated that, although Father briefly maintained suitable housing, he refused to verify proof of employment. *Id*. at 96, 98.

As revealed by the foregoing testimony, the evidence in the certified record sustains the orphans' court's decision to terminate Father's parental rights pursuant to § 2511(a)(1). Stated plainly, Father failed to perform parental duties and neglected to exert a sincere and genuine effort to maintain a parent-child relationship. Moreover, he rebuffed the services and resources that OCY attempted to provide. Father refused to participate in

parenting classes, obtain employment, or verify that he had maintained adequate housing, and he made minimal efforts toward sobriety. He failed the only two drug screens that he submitted in the six months between January 2014 and July 2014, and on fifty-six other occasions during that period, he simply refused to submit a sample for testing.

Next, as it relates to the additional considerations outlined in **In re Z.S.W.**, *supra*, regarding Father's explanations for his behaviors and any post-abandonment contact, we observe that there has been minimal contact between Father and H.L.P., Jr. since the second adjudication of dependency during January 2014. Counting the supervised visitations, therapeutic sessions, and medical appointments that Father attended, he has interacted with H.L.P., Jr. no more than eight times. N.T., 4/21/15, at 61. Father neglected to demonstrate any interest in maintaining a relationship with H.L.P., Jr. other than sporadic visitation. Furthermore, Father not only failed to provide any explanation for his absence from his son's life during that period, he expressly refused to comply with the drug screening regimen that would have permitted him to increase the frequency and duration of his contact with H.L.P., Jr. during the dependency proceedings. Thus, we find no basis to disturb the orphans' court's determination under §2511(a).

Having concluded that the orphans' court did not err in finding that OCY satisfied its burden pursuant to 23 Pa.C.S. § 2511(a)(1), we next review the orphans' court's needs and welfare analysis under § 2511(b).

The extent of the orphans' court's analysis depends upon the circumstances of a particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that, while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). As we explained in *In re K.Z.S., supra* at 763 (emphasis omitted),

> In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the continuity of relationship to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, *supra* at 483 (Pa.Super. 2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with foster parent, and importance of continuity of existing relationships).

Herein, the orphans' court concluded that severing the frail bond between Father and H.L.P., Jr. was in the child's best interest because the only parental bond that nurtured safety, security, and permanency exists between H.L.P., Jr. and his pre-adoptive Foster Parents. *See* Trial Court Opinion, 6/22/15, at 6-7. Again, the record supports the orphans' court's determination. Ms. Bliley, the assigned OCY caseworker, testified that she observed Father's visitations with H.L.P., Jr. and noted that, while Father was affectionate towards his son, the child did not reciprocate. *Id*. at 58. He repeatedly requested to end the visitations with Father so that he could return to his foster mother. *Id*. at 58. Similarly, Ms. Bliley observed the parent-child interaction during H.L.P., Jr.'s therapy with Ms. Potter. *Id*. at 61. She stated that H.L.P., Jr. was more interested in interacting with Foster Parents than Father during those sessions. *Id*. at 61. She described how H.L.P., Jr. would cling to his foster mother and would only go to Father when he was prompted. *Id*. at 62. Additionally, Ms. Bliley testified that Father failed to pay child support, send correspondence, or provide any gifts. *Id*. at 60. Indeed, Father did not even contact the agency to inquire about his son's well-being. *Id*. at 60-61. Tellingly, H.L.P., never asked Ms. Bliley about Father and he never referred to Father in her presence. *Id*. at 62.

In contrast to his negligible interactions with Father, H.L.P., Jr. is attached emotionally with Foster Parents, whom he refers to as Mom and Dad. *Id*. at 62. He is thriving in the foster home, and Foster Parents satisfy

his "physical, mental, [and] emotional needs." *Id*. In sum, Ms. Bliley opined that H.L.P., Jr. would not suffer detriment if the trial court terminated Father's parental rights. *Id*. at 63. She believes that it is in the child's best interest to remain with Foster parents permanently. *Id*. at 63.

Similarly, Ms. Potter observed that, unlike Father, Foster Parents were engaged in the therapeutic process and cooperative. *Id*. at 22. She testified that H.L.P., Jr. shared a close relationship with Foster Parents. She noted, "[H.L.P., Jr.] would not leave [Foster Parents'] side. He would cling onto them. As a matter of fact, . . . he wanted to be right by them at all times." *Id*. at 27.

In addition, Gaylene Abbott-Fay, the OCY permanency worker that administered H.L.P., Jr.'s placement in foster care, testified about his relationship with Foster Parents. Although she was assigned to this case on September 3, 2014, she was familiar with Foster Parents' history with the child. *Id*. at 66-67. She noted that Foster Parents were a placement resource during the prior dependency proceedings and that they have adopted two of H.L.P.'s half-siblings. *Id*. at 67. Ms. Abbott-Fay further indicated that the five-year-old child had spent the majority of his life in Foster Parents' care. *Id*. at 68. When asked to justify why she believed that there would be no adverse effects from terminating Father's parental rights and why proceeding with an adoption by Foster Parents would serve in H.L.P. Jr.'s best interest, Ms. Abbott explained,

He definitely exhibits strong attachment to that family. He looks to them for support and guidance and nurturing. He does refer to them as mom and dad. And with everything that this child has gone through at this point, he needs permanency before we have further permanent damage.

. . . .

[H]e's demonstrating his attachment to the family. He is part of the family. He participates in all family activities. He doesn't ask about his [birth] mom or dad. He sees [Foster Parents] as the family figures[.]

*Id*. at 70.

Mindful of the intangible factors that we outlined in ***In re A.S.***, ***supra***, such as the love, comfort, security, and stability that H.L.P. Jr., shares with his half-siblings and pre-adoptive Foster Parents, and the importance of maintaining those beneficial relationships, we find sufficient evidence in the certified record to sustain the orphans' court's best-interest analysis. In sum, Father maintained only a nominal bond with H.L.P., Jr., and it is paramount to the child's wellbeing that we preserve the loving, stable relationships that he enjoys with Foster Parents.

For all of the foregoing reasons, we affirm the orphans' court's order terminating Father's parental rights to H.L.P., Jr. pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/9/2015</u>